J-S20028-23 & J-S20029-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| SHANE MCCALL-SCHRANDT | : | No. 2717 EDA 2022 |

Appeal from the Order Entered September 28, 2022,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No(s): CP-51-CR-0003206-2021.

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| NICHOLAS HUNT | : | No. 2719 EDA 2022 |

Appeal from the Order Entered September 28, 2022,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No(s): CP-51-CR-0003207-2021.

BEFORE: DUBOW, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.: **FILED AUGUST 30, 2023**

## I. Introduction

In these related, interlocutory appeals as of right,[1] the Commonwealth

contests an order suppressing two guns that police seized during a routine,

traffic stop: one from Shane McCall-Schrandt and one from Nicholas Hunt.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** Pennsylvania Rule of Appellate Procedure 311(d). Although we did not
consolidate these two appeals, we dispose of them in the same decision.

At the suppression hearing, the Commonwealth did not produce evidence to justify the arrest and search of McCall-Schrandt, and we affirm the order as to him. However, the Commonwealth met it burdens of production and persuasion with regards to the frisk of Hunt. Thus, we reverse the suppression order as to him and remand his case for trial.

## II. Factual & Procedural Background

On March 8, 2021, around 9:45 p.m., Hunt and McCall-Schrandt were passengers in a sedan driving through Philadelphia. Hunt rode in the front seat, while McCall-Schrandt was in back. Because the driver ran a stop sign, Officers Pedro Martin and Anthony Agudo stopped the car. Officer Martin approached on the driver's side, and Officer Agudo approached on the passengers' side.

The driver "was extremely nervous throughout the encounter." Trial Court Opinions, 12/22/22, at 2.[2] His "hands were shaking, he was shuffling in his seat, and he was sweating even though it was cold." *Id.* When Officer Martin asked the driver about the group's travel plans, he said "they were coming from 'The Studio,' . . . ." *Id.* Officer Martin knew The Studio was "a place from which many illegal firearms had been recovered in the past." *Id.*

Next, the officers collected identification from the driver and passengers. Officer Agudo returned to his car, sat in the passenger seat, and entered the

---

[2] The trial court filed two Rule 1925(a) Opinions, one at each docket number. At times, the Trial Court Opinions are identical. When they are, we refer to Opinions, plural. However, when something only appears in one Opinion, we refer to that Opinion by the Appellee's name.

information for the three men into the in-cruiser-computer system. Officer Martin walked back to the police vehicle, leaned in the driver's window, and spoke with Officer Agudo. *See* Commonwealth Ex. C-1 at 2:44-2:55.[3] As the officer's bodycam video depicted, Officer Martin asked Officer Agudo whether he thought the men "brought some props" – *i.e.*, firearms – from The Studio. *Id.* at 3:03-3:07; *see also* N.T., 9/28/22, at 20. After a minute of silence, Officer Martin asked, "Wanna see if he'll give me permission [to search the car]?" *Id.* at 4:15-4:17. Shortly thereafter, he returned to the stopped vehicle and asked the driver, "You're positive there's nothing [illegal] in this car?" *Id.* at 5:10-5:18.

The driver looked down and said, "Sir, this is my car. Umm, nothing of mine . . . ." *Id.* at 5:21-5:23.

Officer Martin interrupted him to ask, "You mind if I check?" *Id.* at 5:23.

"Umm, no I don't," the driver initially said but then quickly changed his mind; he said, "I do, actually." *Id.* at 5:24-5:27. The officer asked why he minded, and the driver became animated and said, "I just feel uncomfortable right now; I feel like I'm being threatened." *Id.* at 5:30-5:31.

Officer Martin replied, "You look like you're extremely nervous, dude. But you're sweating; look at your forehead." *Id.* at 5:31-5:37.

---

[3] At the suppression hearing, the prosecutor played Ex. C-1 from 0:00 until 6:42. *See* N.T., 11/28/22, at 12-14. No one played the additional 15 minutes of bodycam footage on this file at the suppression hearing.

The driver said, "Yeah, yeah, I do, because I - - I don't like - - I don't like to be around police, sir. I just came from the gym, literally." *Id.* at 5:33-5:39.

The officer then asked, "Have you ever been - - Have you ever been, ah . . . ." *Id.* at 5:30-5:41.

"No, I never been stopped. Nothing." *Id.* at 5:42-5:43. Thereafter, the officer ordered the driver to place his keys on the car's roof and to exit the vehicle. *See id.* at 5:45-6:42; *see also* N.T., 9/28/22, at 15. Officer Martin immediately frisked him, but the search of the driver revealed nothing.

Officer Martin then moved to the rear of the vehicle and waited while Officer Agudo removed Hunt from the front-passenger seat. *See id.* at 14-15. Officer Agudo directed Hunt to go and see Officer Martin. *See id.* at 35. "Officer Martin then noticed a heavy object weighing down the right side of [Hunt's] jacket and immediately frisked him." *Hunt* Trial Court Opinion, 12/22/22, at 2. The officer felt and removed a semiautomatic firearm from Hunt's pocket and arrested him. *See id.*

Meanwhile, Officer Agudo spoke with McCall-Schrandt, who sat calmly in the backseat. Ultimately, Officer Agudo ordered McCall-Schrandt out of the vehicle. Other officers eventually retrieved a gun from McCall-Schrandt.

Police charged both Hunt and McCall-Schrandt with (1) Carrying a Firearm without a License and (2) Carrying a Firearm on the Public Streets of

Philadelphia.[4] The co-Defendants moved to suppress the seized firearms on the grounds that the searches of their persons were unreasonable in violation of Fourth Amendment to the Constitution of the United States and Article I, § 8 of the Constitution of the Commonwealth of Pennsylvania. **See** N.T., 9/28/22, at 2-4. Only Officers Martin and Agudo testified at the hearing.

Of particular importance to this appeal, while cross examining Officer Agudo, McCall-Schrandt's counsel only played a few seconds of video from Commonwealth Ex. D-1, a file with over 20 minutes of footage. No one identified the file times when defense counsel started and stopped the video. **See** N.T., 9/28/22, at 41. However, based on the transcript, we infer that the portion of Commonwealth Ex. D-1 that counsel played was approximately between 1:35 and 1:45, where the video matches Officer Agudo's testimony of what defense counsel played at the hearing.

In those ten seconds, Officer Agudo shined his flashlight onto McCall-Schrandt, who sat very still in the back of the car, with his hands folded in his lap. The officer asked, "Any weapons on you, sir?" Commonwealth Ex. D-1. at 1:40.

McCall-Schrandt shook his head side to side, said "No," and turned his head away from the officer. **Id.** at 1:41-1:42.

"There was a brief redirect following the cross examination . . ." **McCall-Schrandt** Trial Court Opinion, 12/22/22, at 3. "However, the Commonwealth

---

[4] **See** 18 Pa.C.S.A. §§ 6106(a)(1) and 6108.

provided no additional evidence which disputed the evidence provided by the bodycam." *Id.* "Further, the Commonwealth did not seek to provide any additional review of the bodycam footage for clarification of the inconsistent statements made by the officer." *Id.* The Commonwealth also failed to offer any evidence concerning the search or arrest of McCall-Schrandt. *See id.*

Next, the suppression court heard oral argument and issued its findings of fact and conclusions of law from the bench. *See* N.T., 9/28/22, at 45-53. The suppression court found that "Officer Agudo provided incomplete and inconsistent testimony" regarding that interaction. *McCall-Schrandt* Trial Court Opinion, 12/22/22, at 2. Rejecting Officer Agudo's testimony, the court found that the video evidence directly contradicted his version of events:

> On direct examination, [Officer Agudo] testified [that,] before [McCall-Schrandt] exited the vehicle, he inquired if there were any firearms or weapons within the vehicle. [The officer] testified [that McCall-Schrandt] answered there was a firearm on his person, in his name, and he was not licensed to carry it. However, during cross examination, defense counsel introduced Officer Agudo's bodycam footage from the night in question. [*See* Commonwealth Ex. D-1.] When asked the same question regarding additional weapons in the vehicle on the video, [McCall-Schrandt] can be observed saying, "No," while shaking his head.

*Id.*

The suppression court opined, "*Commonwealth v. Alexander*[, 243 A.3d 177 (Pa. 2020),] states that you must have exigent circumstances in order to have a warrantless search of a vehicle." N.T., 9/28/22, at 52.

Because the court found no "exigent circumstances to retrieve any weapons from the vehicle," it granted suppression. *Id.* at 52-53.

This timely appeal followed, and the court of common pleas ordered the Commonwealth to file a Concise Statement of Errors Complained of on Appeal. The Commonwealth complied.

In its 1925(a) Opinions, the court candidly acknowledged that reliance upon **Alexander** at the suppression hearing was misplaced. The court opined, "**Alexander** discusses warrantless searches of automobiles and does not elaborate on [reasonable-suspicion frisks] akin to what took place here." Trial Court Opinions, 12/22/22, at 5, at 7-9. Nevertheless, the court contended the police lacked reasonable suspicion to search McCall-Schrandt and Hunt. Thus, the court opined that its "mention of **Alexander** [during the hearing] was nothing more than a harmless error."[5] *Id.*

---

[5] The court of common pleas appears to have confused the appellate doctrines of "harmless error" and "right for any reason." While similar, the two doctrines are distinct. Harmless error arises post-sentence and pertains to evidentiary issues from trial. "It is well-established that an erroneous evidentiary ruling *by a trial court* does not require us to grant relief where the error was harmless." **Commonwealth v. Hicks**, 156 A.3d 1114, 1139 (Pa. 2017) (Bear, J., concurring) (citing **Commonwealth v. Young**, 748 A.2d 166, 193 (Pa. 1999) (emphasis added). It applies if, among other things, "the properly admitted and uncontradicted evidence of guilt was so overwhelming that the prejudicial effect of the error by comparison could not have contributed to the verdict." *Id.* at 1139–40. The right-for-any-reason doctrine, by contrast, applies to any order or judgment on appeal. Under this doctrine, "where the result is correct, an appellate court may affirm a lower court's decision on any ground without regard to the ground relied upon by the lower court itself." **Commonwealth v. Lehman**, 275 A.3d 513, 520 (Pa. Super. 2022), *appeal denied*, 286 A.3d 213 (Pa. 2022). Right for any reason, then, is broader than

*(Footnote Continued Next Page)*

### III. Analysis

The Commonwealth raises two appellate issues. First, it asks whether the suppression court "err[ed] in suppressing a firearm seized from [McCall-Schrandt] during a lawful traffic stop and after he admitted he was in possession of a gun and was not licensed to carry one?" Commonwealth's Brief, 2717 EDA 2022, at 4. Second, the Commonwealth asks whether the suppression court "err[ed] in suppressing a firearm seized from [Hunt] during a lawful frisk for weapons?" Commonwealth's Brief, 2719 EDA 2022, at 4. We review the search of each Appellee separately.

### 1. The Search of McCall-Schrandt

Beginning with McCall-Schrandt, the Commonwealth argues that the police obtained the gun on McCall-Schrandt's person through a lawful search, incident to his arrest. According to the Commonwealth, "police seized the gun from [his] waistband during a traffic stop and after he admitted he had a gun on his person and was not licensed to possess one." Commonwealth's Brief, 2717 EDA 2022, at 16. The Commonwealth believes that McCall-Schrandt admitted to possessing a firearm without a license. Therefore, it attacks the suppression order based on its assertion of "probable cause to arrest him for violating the firearms laws and [officers] could search him incident to his

_____

harmless error. It is clear from the trial court's Opinions that it is requesting that we affirm its suppression order under the right-for-any-reason doctrine.

arrest." *Id.* at 22 (citing *Commonwealth v. Valentin*, 748 A.2d. 711 (Pa. Super. 2000)).

This argument necessarily challenges the finding of the suppression court that Officer Agudo's testimony about McCall-Schrandt was "inconsistent with the video evidence." *Id.* at 24. Specifically, the Commonwealth disagrees with the factual finding that the part of Commonwealth's Ex. D-1, which played during cross examination of the officer, contradicted the officer's direct testimony. The Commonwealth concedes that the portion of the exhibit, which defense counsel played, "showed that when the officer asked [McCall-Schrandt] if there were any weapons, he shook his head and answered 'no.'" *Id.*

Even so, it claims that the suppression court "misapprehended Officer Agudo's testimony." *Id.* According to the Commonwealth, "Officer Agudo asked [McCall-Schrandt] *on two different occasions* about the presence of any weapons" in the vehicle. *Id.* (emphasis in original). The Commonwealth asserts that the first questioning occurred during the officers' initial interaction with the car's occupants, *i.e.*, before the police returned to their patrol car to process the men's identifications. *See id.* We are told that the second questioning of McCall-Schrandt occurred after Officer Martin frisked Hunt and discovered a gun on him. *See id.* Based on its view of the factual timeline, the Commonwealth argues that McCall-Schrandt said "No" to Officer Agudo's first question, but he then admitted to possessing a gun without a license

when Officer Agudo repeated the question several minutes later. *Id.* at 25 (citing N.T., 9/28/22, at 34-35).

Thus, the Commonwealth believes the suppression court confused the facts, because, during cross examination of Officer Agudo, "defense counsel played the portion of the officer's bodycam video that showed the first time he asked [McCall-Schrandt] if there were any weapons." *Id.* Officer Agudo told "defense counsel that if he advanced the video 'probably like a minute or two more,' it would show the latter portion of the car stop when [McCall-Schrandt] was the only person who remained inside the vehicle," which was when he "conceded he had a gun." *Id.* However, no one played that part of the video during the suppression hearing.

The full video evidence on Commonwealth's Ex. D-1 supports the Commonwealth's clarification of the facts on appeal. After Officer Martin recovered Hunt's firearm and arrested him, Officer Agudo walked back to McCall-Schrandt, who was still seated in the back of the car. *See* Commonwealth's Ex. D-1 at 7:45-8:16. Officer Agudo requestioned McCall-Schrandt about whether there was another weapon in the car. *See id.* McCall-Schrandt told the officer, "I have another weapon in the car. It's on my hip to protect myself." *Id.* at 8:22-8:25. He also admitted that he had no license to carry a firearm. *See id.* at 8:27-8:28.

The Commonwealth argues, under *Valentin*, *supra*, McCall-Schrandt's admissions was probable cause to arrest him and then conduct a search of his person incident to that arrest. We agree. If we were permitted to conduct a

plenary review of all the evidence from the night of the traffic stop, we would conclude Officer Agudo did **not** violate McCall-Schrandt's rights. However, our scope of review for a warrantless search is not plenary.

"It is axiomatic that the nature of the record below controls the appellate court's scope of review." **In re L.J.**, 79 A.3d 1073, 1085 (Pa. 2013). When reviewing a suppression order, our scope of review is confined to the evidence that was "part of the suppression record, absent a finding that such evidence was unavailable during the suppression hearing." **Id.**

Here, the prosecutor neglected to play timeframe 7:45-8:28 from Officer Agudo's bodycam at the suppression hearing. As the suppression court correctly stated, "the Commonwealth did not seek to provide any additional review of the bodycam footage for clarification of the inconsistent statements made by the officer." **McCall-Schrandt** Trial Court Opinion, 12/22/22, at 3. Therefore, the suppression court had no opportunity to view the part of the bodycam footage upon which the Commonwealth relies to rehabilitate Officer Agudo's credibility.

As the court of common pleas observes in its 1925(a) Opinion, "in all cases, the burden of production is upon the Commonwealth." **McCall-Schrandt** Trial Court Opinion, 12/22/22, at 3 (quoting **Commonwealth v. Enmipah**, 106 A.3d 695, 697 (Pa. 2014) and Pa.R.Crim.P. 581) (some punctuation omitted). In fact, "the Commonwealth carries the burden at suppression and satisfies that burden if it **proves to the satisfaction of the**

*suppression court* that the evidence was properly seized." *In re L.J.*, 79 A.3d at 1086 (emphasis added).

The suppression court, based on the very narrow portion of Officer Agudo's bodycam that it viewed, found that the Commonwealth did not meet its burden of production. We are unable to disturb that factual finding, because the Commonwealth did not play Commonwealth's Ex. D-1 at 7:45-8:28. It did not make that portion of the video file "part of the suppression record." *In re L.J.* at 1085. Further, the Commonwealth never asked the suppression court to review the entire file of Commonwealth's Ex. D-1 or the clip revealing that McCall-Schrandt confessed to possessing a gun without a license. Nor did it object to the suppression court viewing only the portion of that exhibit that McCall-Schrandt's counsel played. Thus, the Commonwealth has waived any procedural or evidentiary error that the suppression court may have made by not reviewing the full exhibit. *See* Pa.R.A.P. 302(a).

As such, the bodycam footage proving that Officer Agudo obtained a confession from McCall-Schrandt before arresting and searching him is outside our scope of review. We may not rely upon the video footage from 7:45-8:28 to revisit Officer Agudo's credibility on appeal.

Moreover where, as here, police conducted a warrantless search and arrest, and the defendant has won the motion to suppress, our scope of review is limited to "only the evidence from the defendant's witnesses together with the evidence of the prosecution that . . . *remains uncontradicted.*" *Commonwealth v. Adorno*, 291 A.3d 412, 415 (2023) (emphasis added).

We employ this pro-defendant scope of review where, as here, the arrest and search incident thereto were warrantless.

The Fourth Amendment dictates, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amnd. IV. "The Fourth Amendment, by its text, has a strong preference for searches conducted pursuant to warrants." *Commonwealth v. Leed*, 186 A.3d 405, 413 (Pa. 2018). Given this preference, the jurisprudence surrounding searches and seizure favors law enforcement when police get a warrant. Our scope and standard of review are different for searches conducted with or without a warrant.

When police respect the constitution's strong preference for warrants and seek judicial approval **before** invading someone's privacy, our appellate scope of review is confined to the "affidavits on which warrants are issued" and may not "move beyond the 'bare bones' affidavits." *Illinois v. Gates*, 462 U.S. 213, 239, (1983). In such situations, our scope of review is limited to the officer's *ex parte* version of events, as related to a judge during the investigation. The defendant has no real opportunity to refute facts in the affidavit.

By contrast, when police choose to act without prior judicial approval and conduct warrantless searches, the appellate court must defer to the findings of the suppression court and may "review [them] only for clear error . . . ." *Ornelas v. United States*, 517 U.S. 690, 699, (1996). In these

instances, the suppression court's findings of fact may turn out to be the version of events that the defendant presented at the hearing. Hence, by not seeking a warrant, officers run the risk that the suppression court will reject their recollection of events as inaccurate.

This case illustrates the point. Based on the evidence of record that the parties developed **at the suppression hearing**, the suppression court's factual finding that the testimony of Officer Agudo was incredible is far from "clear error." **Id.** The suppression court found that the portion of the video played during cross examination contradicted Officer Agudo's testimony that McCall-Schrandt confessed to possessing a gun without a license. Officer Agudo was a witness for the prosecution. Our review of the ten seconds of video evidence that McCall-Schrandt admitted at the suppression hearing confirms the suppression court's factual finding that Officer Agudo's testimony was incredible.

Accordingly, under **Ornelas** and **Adorno**, **supra**, the Commonwealth's reliance upon portions of the video that it did not play during the suppression hearing is misplaced. The Commonwealth's revision of the facts (while historically correct) rests upon evidence outside the record that the parties developed at the suppression hearing. Simply stated, the Commonwealth never showed the suppression court the evidence necessary to rehabilitate Officer Agudo. It may not rehabilitee his credibility in this Court based on evidence that the suppression court never saw, because our scope of review is limited to suppression-hearing evidence. **See In re L.J.**, **supra**.

Thus, there is no evidence within our scope of review showing that McCall-Schrandt confessed to Officer Agudo. As such, the Commonwealth's first issue is meritless, and we affirm the order of suppression as to McCall-Schrandt.

## 2. The Frisk of Hunt

Next, the Commonwealth contends that Officer Martin had reasonable suspicion to conduct a frisk of Hunt, and that that constitutional frisk revealed the firearm he was carrying. Because the search was constitutional, it claims the suppression court erred in ordering suppression of this gun. We agree.

Unlike the prior issue, where the Commonwealth disputed a finding of fact, here it challenges a pure question of law – namely, whether the totality of the circumstances provided Officer Martin with reasonable suspicion that Hunt could have been armed and dangerous. Here again, the search of Hunt was warrantless; thus, our standard of review comes from **Ornelas**, **supra**. On appeal, "questions of reasonable suspicion and probable cause to make a warrantless search [are] reviewed *de novo*." **Ornelas**, 517 U.S. at 691.

The seminal case of **Terry v. Ohio**, 392 U.S. 1 (1968), governs the legal standard for a momentary stop and frisk. There, an officer observed three men casing a store. Suspecting that they might be armed and dangerous, he frisked all of them. The pat downs revealed that two of the men were carrying illegal firearms, which they sought to suppress prior to trial. The Supreme Court of the United States held that it is reasonable to stop a suspect "where a police officer observes unusual conduct which leads him reasonably to

conclude in light of his experience that criminal activity may be afoot." *Id.* at 30.  The High Court also held that, under the Fourth Amendment, police may frisk the suspect's outer clothing, so long as the officer has reason to believe the suspect is "armed and dangerous." *Id.*

To determine whether there is reasonable suspicion that a suspect is armed and dangerous, the applicable standard is an objective one.  *See id.* at 21-22.  The High Court opined that police officers "need not be absolutely certain that the individual is armed;" rather, the appropriate standard is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27.  Under this standard, the officer's frisk of the three men passed constitutional muster, and the *Terry* stop and *Terry* frisk entered our jurisprudence.

Here, the officer preformed a *Terry* frisk of Hunt after removing him from the vehicle.[6]  In its 1925(a) Opinion, the court of common pleas stated

---

[6] We note Hunt conceded in the suppression court that the stop of the car and his subsequent removal from it were constitutionally permissible.  *See* N.T., 9/28/22, at 3.  His counsel said, the police "can get [him] out of the car; they can look . . . but then they pat[ted] him down."  Hunt only challenged the pat down as "unlawful and unconstitutional." *Id.*

Similarly, we recognize that neither defendant raised *Commonwealth v. Alexander*, 243 A.3d 177 (Pa. 2020), at the suppression hearing.  Thus, the suppression court relied upon that decision, *sua sponte*, to grant the motions to suppress.  As mentioned above, the court of common pleas recognized that this was error in its 1925(a) Opinion.  The Commonwealth likewise contends that this was error on appeal.  *See* Commonwealth's Brief, 2719 EDA 2022, at 22.  We agree with the Commonwealth and the court of common pleas; *Alexander* is not pertinent to the facts of this case, because
*(Footnote Continued Next Page)*

that the search was improper, "because neither officer articulated specific facts which demonstrated they had the reasonable suspicion necessary to search [Hunt]." Trial Court Opinion, 12/22/22, at 3. In explaining why, in its mind, reasonable suspicion was lacking, the court said:

> neither Officer Agudo nor Officer Martin articulated specific facts or inferences which would have demonstrated [Hunt] may have been armed, dangerous, or a risk to their safety. First, both officers admitted only the driver was behaving in a strange manner, which can be easily explained due to nervousness he felt in experiencing a traffic stop for the first time. Then, Officer Martin admitted during testimony he engaged in a lengthy conference with Officer Agudo regarding how to coerce the vehicle's occupants to consent to a search, showing neither officer harbored reasonable fears regarding the situation. Lastly, Officer Agudo testified [Hunt] was cooperatively answering their questions and not showing much nervousness. Therefore, this court disagrees with the Commonwealth's contention that either officer had the reasonable suspicion necessary to search [Hunt] . . . .

*Hunt* Trial Court Opinion, 12/22/22, at 4-5.

This analysis is erroneous on several grounds. Initially, we observe that the contentions of the suppression court are based, in part, on its view of the officer's **subjective** lack of fear. Even if the "lengthy conference" that the officers had "regarding how to coerce the vehicle's occupations to consent to a search" proved that the officers' did not have "reasonable fear," the officers

_____

the police did not conduct a warrantless search of the vehicle. They conducted warrantless searches of persons after they were removed from the car.

Thus, we confine our review to the issue Hunt raised and litigated in the suppression court – *i.e.*, that Officer Martin conducted an unreasonable ***Terry*** frisk.

- 17 -

personal fear (or lack thereof) is not part of the constitutional test under **Terry**. **Id.** Instead, the test under **Terry** is an objective one, regarding "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." **Terry**, 392 U.S. at 27. The level of an officer's fear or bravery is irrelevant.

The Supreme Court of Pennsylvania has explained, "In order to justify a frisk under **Terry,** the officer 'must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.'" **Commonwealth v. E.M.**, 735 A.2d 654, 659 (Pa. 1999) (quoting **Sibron v. New York**, 392 U.S. 40, 64, (1968)). Because a warrantless **Terry** frisk is permitted with reasonable suspicion, a standard less than probable cause, the frisk must be strictly "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." **Minnesota v. Dickerson**, 508 U.S. 366, 373, (1993) (quoting **Terry,** 392 U.S. at 26).

Additionally, the 1925(a) Opinion fails to consider the totality of the circumstances. There are two major facts that the suppression court found that weigh greatly into our analysis of whether Officer Martin had reasonable suspicion to frisk Hunt, which the suppression court omitted from its analysis.

First, the driver told Officer Martin that they were coming from The Studio. Due to his seven years' knowledge of the area, "Officer Martin immediately recognized 'The Studio' as a place from which many illegal firearms had been recovered in the past." **Hunt** Trial Court Opinion,

- 18 -

12/22/22, at 2. This information was the primary reason that this routine traffic stop elevated to a firearms investigation. If the driver had said, "We're coming from Wawa's," Officer Martin would likely not have suspected that illegal guns were in the vehicle, and this case would not exist.

Second, and more importantly, the suppression court found that, when the police asked Hunt to exit the car, Officer Martin "saw the right side of the jacket weighed down . . . ." N.T., 9/28/22, at 51. Indeed, Officer Martin "observed the right side of his jacket weighed down by a heavy object . . . ." *Id.* at 10. This made the officer want "to frisk that pocket to make sure it wasn't a firearm, because it was a heavy object weighing his jacket down . . . ." *Id.*

This observation of Hunt's jacket pocket, when considered with the totality of the circumstances, renders Officer Martin's decision to frisk Hunt eminently reasonable. Officer Martin knew that the men in the car were leaving a location notorious for trafficking in illegal firearms, the driver was extremely nervous to the point that he was sweeting on an early March night, and Hunt had a heavy object visibly weighing down his jacket pocket. A reasonably prudent person in the Officer Martin's position might well and rationally conclude that the heavy object in Hunt's pocket was one of The Studio's illegal firearms.

Finally, the fact that the suppression court found Hunt to be calm and cooperative with police is irrelevant. It does not render Officer Martin's conclusion that Hunt was armed and dangerous any less reasonable. This

Court has held, "cooperation with police does not erase an otherwise valid belief that a defendant may have access to a gun." *Commonwealth v. Tuggles*, 58 A.3d 840, 844 (Pa. Super. 2012).

Accordingly, we conclude that Officer Martin had reasonable suspicion to perform a *Terry* frisk of Hunt. The alternative basis on which the court of common pleas would have us sustain its erroneous decision to suppress Hunt's firearm is unavailing.

The Commonwealth's second claim of error warrants to appellate relief. Thus, we reverse the order of suppression as to Hunt and remand his case.

Order at 2717 EDA 2022 affirmed. Order at 2719 EDA 2022 reversed and remanded for trial.

Jurisdiction relinquished.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 8/30/2023*